## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **SHANTA MONEAK DUNCAN** | **CIVIL ACTION** |
| **VERSUS** | **NO:    18-06143** |
| **CHRISTOPHER O. CELESTINE ET AL** | **SECTION: "F" (4)** |

### REPORT AND RECOMMENDATION

Before the Court is Plaintiff Shanta Moneak Duncan ("Duncan")'s **Motion for Default Judgment (R. Doc. 52)** seeking a default judgment against Cristopher O. Celestine ("Celestine"), which was referred to the undersigned United States Magistrate Judge to conduct hearings and to submit proposed findings and recommendations pursuant to **28 U.S.C. 636(b)(1)(B) and (C).** The Court held oral argument on the motion on December 11, 2019. Rec. doc. 75.

I.    **Factual Summary**

Plaintiff filed this action on June 21, 2018 against three defendants: Jazz Casino Co. LLC ("Jazz Casino"), Harrah's New Orleans Management Company, LLC ("Harrah's"), and Christopher O. Celestine. Plaintiff alleges that on July 3, 2017, Celestine touched her vagina as she was entering Harrah's New Orleans Casino. Rec. doc. 1, p. 3. Plaintiff maintained that Jazz Casino and Harrah's are vicariously liable for Celestine's actions and independently liable for negligent hiring and supervision. Duncan seeks damages pursuant to Louisiana Civil Code Articles 2315 and 2320 for assault, battery, sexual assault, sexual battery, and negligent infliction of emotional distress. Rec. doc. 1, p. 4.

Plaintiff arrived at Harrah's around 12:30 a.m. on July 3, 2017. Rec. doc. 1, p. 3. Plaintiff was alone when she entered the casino, stopped at the security desk in the tunnel, and had a conversation with the security officer, later identified as Celestine, who worked at that post.  The

security officer offered to give Plaintiff tickets to a concert and Plaintiff gave the security officer her phone number so he could call her about the tickets. When no one else was in the area, the security officer told Plaintiff he was trying to see what was under her dress and then he reached down and touched her. The security officer lifted Plaintiff's dress to the side, put his hand underneath her dress and touched her underwear in her vaginal area.

Celestine appeared for the hearing and advised the Court that he was served with the complaint. He also acknowledged that he wrote a letter on November 1, 2019, which was filed on November 4, 2019, and indicated that he lost his job as a result of the incident, he had since suffered seriously injured and hospitalization, and he was now unable to provide for his kids. Rec. doc. 73. Celestine, also in the letter addressed to the Court, denied all allegations made by Ms. Duncan and indicated his belief that he should be cleared of all claims against him. *Id.* Duncan's counsel indicated that, to the degree the letter is an answer, it was filed to late. After explaining to Celestine the definition of a default judgment, as well as its impact on him, Celestine did not oppose the entry of a default judgment.

### a. Duncan Testimony

Shanta Moneak Duncan, originally from Hattiesburg, Mississippi, testified that on July 3, 2017, she went to Harrah's Casino and entered through the tunnel. She stated that Celestine mentioned to her that he could get tickets for a Rick Ross concert and asked her if she wanted tickets. She testified that she advised him that she would not be in town on the date of the concert, but that she had some friends who were coming into town. He then indicated, according to Duncan, that if she gave him her telephone number, he would call her when he got the tickets. Duncan admitted to giving Celestine her number on a paper napkin.

According to Duncan, Celestine then put his hands under her dressed and asked her what she had on under the dress and touched her panties. She, thereafter, left the area and went upstairs. There she found another security guard and reported that she was assaulted. She was told that she needed to call (504) 533-6000. Duncan also spoke with a cashier who told her that she had to call the number which was the only way for her to report the incident.

Duncan testified that she left the casino and went back to the area where Celestine was located in order to get his name. She testified that he stepped back as though attempting to shield his name tag, but she eventually got his name. She testified that she left the facility and called the number several times, but she was placed on hold. The person on the line eventually hung up the phone and Duncan dialed the number again. She called her father and told him what happened; he told her to return to the casino and not leave until she spoke with someone. When she arrived back at the casino, Duncan spoke with another woman at the casino and then Stacey Dorsey ("Dorsey"), a manager at Harrah's, came down stairs and told one of the guys to get a report. One of the guys, at some point thereafter, identified Celestine as the perpetrator because Duncan could only describe his post. She was then told that Harrah's would get back with her.

Duncan also reported the incident to the police and, again, was told to call Harrah's number. She testified that she went back to Hattiesburg, Mississippi, and, the following day, she received a call from Dorsey who apologized for what happened to her. Dorsey then gave Duncan the non-emergency police number, which she called, to report the incident; she was told she would need to make a report at the scene of the crime.

Duncan testified that the police officer who first arrived told her that, given the nature of the incident, he would have to call the sex crimes unit and later made a report. She testified that she later reviewed the video of the incident with her lawyer. Since the incident, Duncan maintains

she is reluctant to travel. She testified that prior to the incident she used to travel all time with her girlfriends, and she would even frequently travel to New Orleans alone. Duncan explained that before this incident she never feared anything happening to her, but that, since the incident, she has begun drawing back and becoming a loner.

Duncan testified that she was sexually molested when she was eight years old when her mother's friend reached up under her shorts and touched her on her private parts. She did not tell anyone then and first told someone when she was an adult. She said this experience felt like the earlier childhood experience again. It pulled her back to a period of darkness and loneliness. She said that she felt loneliness and emptiness and stopped going out with her friends, despite testifying that she is invited to a lot of events. The experience also changed how she viewed people in power.

Duncan testified that she has three daughters and she would not want them to experience anything like this. She later acknowledged that her fourteen-year-old lives in Tennessee with her father. Duncan, however, lives in Atlanta, Georgia, where she lived for the last two years, and will visit with them after Christmas. She later testified that her fourteen-year-old was eleven years old at the time she left. Duncan also stated that she has a son who is twenty-one years old and will soon be stationed in Georgia.

Duncan testified that she did counseling at her current church and at her former church. She testified that her children's father is a pastor who has also helped her. She testified that she did not seek formal counseling because she could not afford it, but she stated that she attended women's ministry group where she talked about her experience. She also testified that she participated mainly in the one-on-one sessions because this allowed her to tell her story on her terms. She testified that she calls her daughters who are fourteen, twenty-four, and twenty-five more frequently because she often worries about their wellbeing.

Duncan testified that she has been an actress for the last three to four years, and she is professionally trained. She testified that professionally she has had an acting coach, as well as instruction from directors. Duncan stated she was trained by Greg Williams, her acting coach, for a nine-month period. She was in a commercial for Greystone College and an informercial for Simply Mean. She testified that these jobs were about two or three years ago, but that she did another project involving OWN network more recently in June of 2018.

Before becoming an actor, Duncan worked for the Shelby County Sheriff's Office (2004-2013) and then the Fulton County Sheriff's Office (2013-2014) in booking and processing unit. She explained she inevitably left Fulton County in 2014 because of the stress of her coworkers and the inmates. She testified that she just wanted to do something different.

Duncan also testified that she started two nonprofits called One Hundred Men and Counting and Feed the Streets. Through these nonprofits, she helped people who were incarcerated. She testified that she would do a coat drive for women and shoe drive for kids. She testified that she funded these nonprofits by starting a Facebook group from which she would receive volunteers and monetary donations.

Thereafter, in 2016, Duncan went to Los Angeles, California to further pursue her acting career. After about one year, she decided, however, to return to Atlanta. She testified that she would travel back and forth from Atlanta to California. She did not receive any job opportunities while in California, and she lived on the grace of a male friend. When he left California, she also left.

At present, Duncan is employed as a hostess for a restaurant at the Atlanta Hartsfield Airport and testified that she is not sure she can perform her job effectively without feeling

someone might do something to her on her job. She has only been working at the airport for a few months.

Duncan also testified that when she submits applications for employment for acting roles the subject matter of the incident may come up because this case is accessible online. According to Duncan, she is constantly being asked about this lawsuit. She had two of her coworkers from the airport tell her that they knew some things about her. She stated that she does not want to have to relive this event. She states she is in a slow recovery.

Duncan testified that in July 2017 when she visited Harrah's she was not employed, but she was self-employed as an Uber and Lyft driver. She stated she started working as a rideshare driver in late 2015 and continued driving through July 2017.

Duncan finally testified that she attends Word of Faith Church where she received counseling from September 2017 to January 2018 and then again from August 2018 through December 2019. Duncan later conceded on questioning by the Court that she would just call into the prayer line and did not receive official individual or group counseling. Duncan also testified that she received individual counseling from Reverend Nelson with Kings Hill Church for a period of seven to eight months.  Duncan stated that she never received counseling for her childhood incident.

II.    **Standard of Review**

Federal Rule of Civil Procedure ("Rule") 55 governs default judgments. Under Rule 55(a), "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).

After a default has been entered by the Clerk, a party may seek a default judgment under Rule 55(b). "If the plaintiff's claim is for a sum certain or that sum can be made by certain computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount, and costs against a defendant who has been defaulted for not appearing." Fed. R. Civ. P. 55(b)(1). However, "[i]n all other cases, the party must apply to the court for a default judgment . . . [that] may (A) conduct a hearing to conduct an accounting, (B) determine the amount of damages, (C) establish the truth of any allegation by evidence, or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

"'There must be sufficient basis in the pleadings' for the entering of a default judgment, and the court must accept the well-pleaded factual allegations in the plaintiff's complaint." *Meyer v. Bayles*, 559 F. App'x 312, 313 (5th Cir. 2014) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

## III.   Analysis

### a.  Finding of Default

Although judgments by default are generally disfavored, *see Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir.1998), the Court finds that the Defendant's failure to appear impedes the "just, speedy, and inexpensive disposition" of this case on the merits. *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989). Celestine was served with the Original and Amended Complaint via special process server on July 5, 2018. Rec. doc. 10. Celestine failed to file an answer and a default judgment was entered on November 9, 2018. Rec. doc. 14.

Initially, the Court determined because Plaintiff's complaint alleges joint liability against all three Defendant, and—at that time—the claims against the two Harrah's defendants (who timely answered) had not yet been adjudicated, that a liability and damages finding as to Celestine

7

could result in inconsistent judgments. Rec. doc. 20. As such, as of January 22, 2019, the Court found Plaintiff's motion for default judgment premature. *Id.*

On October 25, 2019, a settlement was reached between Plaintiff and Harrah's defendants—Jazz Casino Co., LLC and Harrah's New Orleans Management Company, LLC. Rec. doc. 68. Plaintiff refiled its motion for default judgment accordingly. Rec. doc. 52. On December 11, 2019, the hearing on the default judgment took place. Rec. doc. 75.

Mr. Celestine appeared and participated in the proceeding and rather than express a desire to formally make an appearance he decided to not oppose the entry of a judgment. As such, the Court will "determine whether the facts alleged in the complaint, taken as true, constitute a legitimate cause of action, and if they do, the Court will enter a default judgment in favor of the plaintiff." *Myers v. Powell*, No. 12-2181, 2013 WL 3822414, at *3 (E.D. La. July 23, 2013).

### b. Damages Computation

Duncan seeks damages for assault, battery, sexual assault, sexual battery and negligent infliction of emotional distress for the unwanted touch when Celestine used his hand to go under her dress and touched her panties when she was walking through the tunnel for bag check at Harrah's Casino in New Orleans. Duncan claims that she experienced emotional distress as a result of the experience and had to seek counseling. She also claims that she is afraid to travel now by herself.

The evidence presented consists of Duncan testimony where she described the incident. Additionally, Duncan submitted the surveillance video of the area that night. The video shows Duncan and Celestine engaging in a conversation as described. At some point, Duncan jumps back as it appears that Celestine walked closer in her direction. According to Duncan, it was at this point that Celestine put his hand under her dress and touched her underwear.

The photographic evidence presented by Duncan shows that she had on an alluring maxi-length dress with high front-facing slits in the front starting at her waistline and ran the length of both legs. Rec. doc. 29-4, Exhibit B. The front of the dress is reminiscent of a loin cloth. *Id.* The top of the dress had a deep-v neckline that plunged down to her navel area. *Id.*

Duncan testified that while she was talking to Celestine who promised her tickets to an upcoming concert, she did not authorize him to touch her let alone reach under her dress to see if she had underwear on. As a result, Duncan contends that Celestine should be held liable for his action.

"A default judgment is a judgment on the merits that conclusively establishes the defendant's liability." *U.S. For Use of M–CO Const., Inc. v. Shipco Gen., Inc*., 814 F.2d 1011, 1014 (5th Cir. 1987). "A default judgment does not, however, establish the amount of damages that the Court will award." *Myers v. Powell*, No. CIV.A. 12-2181, 2013 WL 3832414, at *4 (E.D. La. July 23, 2013). "As a general proposition, in the context of a default judgment, unliquidated damages normally are not awarded without an evidentiary hearing . . ." *James v. Frame*, 6 F.3d 307, 310 (5th Cir. 1993).

### i. *Assault and Battery*

"Assault is an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. 14:36. In the context of Louisiana delictual law, the intentional tort of "battery" is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Landry v. Bellanger*, 02-1443 (La. 5/20/03), 851 So.2d 943, 949. An "assault" is, generally speaking, the threat of such harmful or offensive contact. *Lawson v. Straus*, 95-1537 (La. App. 4 Cir. 3/14/96), 673 So.2d 223, 226.

"The defendant's intention needs not be malicious nor need it be an intention to inflict actual damage. It is enough if the defendant intends to inflict either a harmful or offensive contact without the other's consent." *Landry*, 851 So.2d at 949.

"Consent is an absolute defense in a sexual assault case; if no intentional tort was committed, then no tort was committed." *Doe v. Breedlove*, 04-0006 (La. App. 1 Cir. 2/11/05), 906 So.2d 565, 577. "Similarly, the defense of consent is a bar to recovery for the intentional infliction of harmful or offensive touching." *Cole v. Department of Public Safety and Corrections*, 01-2123 (La. 9/4/02), 825 So.2d 1134, 1142.

In order to succeed on a battery claim, the plaintiff must prove "all prima facie elements of the tort, including lack of consent to the invasive conduct." *Landry*, 851 So.2d at 954. In context of an intentional act in accordance with Louisiana tort law, "is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Breedlove*, 906 So. 2d at 572

"Negligence has long been defined in terms of the reasonableness of a person's conduct or belief, based upon an objective standard." *Id.*, at 573. Thus, it is only logical

> [I]f a person had the reasonable belief that another consented to sexual activity, the former cannot be said to be 'negligent' in failing to secure absolute proof of such consent before engaging in the activity, since he was acting reasonably, even if under a mistaken belief. But if the actor did not reasonably believe consent was given or should reasonably have known that supposed consent was withdrawn, pursuing such activity clearly goes beyond negligence, by virtue of its inherent character; sexual contact can rightfully be characterized as the ultimate violation of personal physical integrity, short of death.

*Id.* As such, as intentional torts assault and battery cannot result from careless conduct; it can only result from intentional contact. *Id.*

### ii.  Negligent Infliction of Emotional Distress

"Recovery for negligent infliction of emotional distress has been limited to those cases involving the 'especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.'" *Walker v. Allen Par. Health Unit*, 97-1007 (La. App. 3 Cir. 4/1/98), 711 So. 2d 734, 736, *writ denied*, 98-1698 (La. 10/9/98), 727 So. 2d 440 (citing *Moresi v. State Through Dep't of Wildlife & Fisheries*, 567 So. 2d 1081, 1096 (La. 1990)). In *Moresi*, the Louisiana Supreme Court the "type of case for which recovery would be allowed for negligent infliction of emotional distress as 'cases allowing damages for fright or nervous shock, where the plaintiff was actually in great fear for his [or her] personal safety.'" *Vallery v. S. Baptist Hosp.*, 630 So. 2d 861, 866 (La. Ct. App. 1993), *writ denied*, 634 So. 2d 860 (La. 1994) (citing *Moresi*, 567 So.2d at 1096).

Moreover, to recover for negligent infliction of emotional distress, Louisiana courts require the plaintiff to prove an underlying negligence claim. *Pelitire v. Rinker*, 18-501 (La. App. 5 Cir. 4/17/19), 270 So. 3d 817, 830, *writ denied*, 2019-00793 (La. 9/17/19), 279 So. 3d 378. "There must be proof that the defendant violated some legal duty owed to the plaintiff, and the plaintiff must meet the heavy burden of proving outrageous conduct by the defendant." *Id.*

When there is no physical injury, Louisiana "jurisprudence [] has limited such recovery by requiring that the emotional distress be severe and not merely the result of the usual worry or anxiety attendant with the harm." *Doerr v. Mobil Oil Corp.*, 2004-1789 (La. App. 4 Cir. 6/14/06), 935 So. 2d 231, 237, *writ denied*, 2006-1760 (La. 11/3/06), 940 So. 2d 664 (citing *Farr v. Johnson*, 308 So. 2d 884 (La. Ct. App. 1975)). As such, "Louisiana courts have limited recovery to those cases involving factual circumstances where the defendant's conduct was declared outrageous because the defendant was found to have breached a special direct duty to the plaintiff and where

the resulting mental distress the plaintiff suffered was easily associated with the defendant's conduct." *Pelitire*, 270 So. 3d at 830 (internal quotations omitted).

### iii.  Application

The Court, as an initial matter, notes that this damages finding does not take into account any of the testimony Duncan regarding Harrah's acts or omissions, for those entities have settled with Plaintiff. The Court's sole focus as to damages now pertains to the sole remaining Defendant's actions, Christopher Celestine.

The uncontroverted evidence is that Celestine sexually touched Duncan when he reached up under her dress. There is no evidence that Duncan consented to the act in fact the video evidence shows that she moved backwards at the point when Celestine reached in. Although the video does not show where his hand reached, it does show he was reaching in the direction of the lower portion of her body. Accordingly, the Court finds that Celestine sexually battered Duncan by placing his hand under her dress and touching her underwear.

Celestine, however, neither assaulted nor sexually assaulted Duncan because there is no evidence that she was fearful that he was going to touch her let alone in her private area. It seems that when the contact occurred, she was surprised and said, "no, you did not do that." It does not appear as though she expected that, when he reached his hand out, he would engage in such conduct.

Moreover, without delving into an analysis of any duty owed by Celestine to Duncan or a determination of the outrageousness of Celestine's conduct, while Duncan testified to receiving counseling from multiple church sources, Duncan did not present any evidence to the Court which suggested she in anyway changed her behavior as a result of the incident to substantiate a claim of negligent infliction of emotional distress. Duncan did not testify to any sort of genuine and serious

mental distress suffered on account of Celestine's actions, beyond generally motherhood worry and reliving a past traumatic experience—an experience unknown to Celestine at the time of the incident. In fact, beyond the guidance she sought from her church, the only actions Duncan testified she took on account of this incident is more frequently communicating with her two eldest daughters in the form of group text message. The Court is of the opinion that these modest acts are more suggestive of usual worry or anxiety attendant with the contact as opposed to the great fright or nervous shock concomitant with genuine and serious mental distress. Therefore, the Court finds that the claim of intentional infliction of emotional distress fails.

### iv.  *Damages Amount*

Still, having determined that Celestine battered Duncan within the meaning of the law, the next determination is the amount of damages that she sustained as a result of the battery. In connection with this issue, Duncan testified that, as an actress, she is now afraid of traveling by herself. She also testified that now she routinely text communicates with her daughters who are fourteen, twenty-four, and twenty-five who live in Tennessee. She also testified that she attended counseling with her former pastor and the women's ministry of her current church.

She also currently works as a hostess at a restaurant in the Atlanta Hartsfield Airport and indicated that everyone there knows about her incident because when they google her name the lawsuit comes up. She testified that because of her concern for her safety she is unsure whether she can do her job without suffering harm or facing another incident. She did not, however, elaborate on this point.

She also testified that this incident brought back memories of an earlier incident when she was eight years old when a friend of her mother's sexually touched her. Although, she admittedly did not report the incident until she was an adult. She testified, however, that she did promptly

report this incident to the police but stated the police have not elected to pursue charges against Celestine. Duncan's counsel explained that when the New Orleans Police Department attempted to execute an arrest warrant, they found Celestine recovering from a serious and debilitating injury; as such, the police chose to not take Celestine into custody and there have been no further action on the criminal matter since then.

While Duncan testified that she has been living in Atlanta, Georgia for at least three years, and that she had left Tennessee to pursue her dream of acting, there is no evidence indicating that the incident affected her ability to get any acting engagements. As such, the Court notes her continued ability to function and work in positions that require higher than normal social interactions with people. There was also no expert testimony regarding the impact of the experience and the counseling with the women's group was admittedly more consistent with a women's prayer call as opposed to any sort of not individual counseling. Nor was there any sort of testimony provided by any religious counselor.

There is no evidence that this one touch necessarily caused long-term damage to her. Plaintiff did not suffer any physical permanent and lifelong effects from this unwanted touching such as a scar. She did not need to seek any sort of medical attention. The incident, although repugnant and inappropriate, was also the result of a single swift contact as opposed to multiple repeated or prolonged contacts. It is understandable that Duncan was angry as a result of the incident, however, the Court is not persuaded that her damages were significant given her testimony.

The Court listened to the testimony of Ms. Duncan and considered all the evidence. It is, therefore, recommend that Duncan be an award of $3,500.00.

**IV.**    **Recommendation**

Accordingly,

**IT IS RECOMMENDED** that the Plaintiff's **Motion for Default Judgment (R. Doc. 52)** be **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER RECOMMENDED** that judgment be entered in favor of Plaintiff Shanta Duncan and against Defendant Christopher Celestine for battery and/or sexual battery.

**IT IS FURTHER RECOMMENDED** that judgment be entered in favor of Defendant Cristopher Celestine and against Shanta Duncan for assault/sexual assault.

**IT IS FURTHER RECOMMENDED** that judgment be entered in favor of Defendant Cristopher Celestine and against Shanta Duncan for negligent infliction of emotional distress.

**IT IS FURTHER RECOMMENDED** that the Plaintiff Shanta Duncan be awarded the sum of $3,500.00.

New Orleans, Louisiana, this 15th day of January, 2020.

**KAREN WELLS ROBY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**